# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs October 25, 2016 at Knoxville

## STATE OF TENNESSEE v. HAYDEN DANIEL RUTHERFORD

**Appeal from the Circuit Court for Sequatchie County**
**No. 2015-CR-79A     Thomas W. Graham, Judge**

---

**No. M2016-00014-CCA-R3-CD – Filed December 13, 2016**

---

The defendant, Hayden Daniel Rutherford, appeals his Sequatchie County Circuit Court guilty-pleaded conviction of robbery, claiming that the trial court erred by ordering that he serve his six-year sentence in confinement.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

B. Jeffrey Harmon, District Public Defender, for the appellant, Hayden Daniel Rutherford.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; J. Michael Taylor, District Attorney General; and Steve Strain, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Originally charged with two counts of aggravated kidnapping and one count of aggravated robbery, all Class B felonies, the 18-year-old defendant pleaded guilty to a single count of the lesser included offense of robbery, a Class C felony, in exchange for a six-year sentence with the manner of service of the sentence to be determined by the trial court.  The summary of facts provided by the State at the guilty plea submission hearing established that the defendant and co-defendants Logan Lepard, Anthony Kaufman, and Rebecca Lorine Shular, accosted the victim, Uriel Martinez, outside a party in Dunlap in retaliation for the victim's having robbed the defendant and Mr. Lepard several weeks earlier.  Ms. Shular lured the victim outside, where the defendant and Mr. Lepard seized him at gunpoint, bound his hands and feet with duct tape, and forced him into the trunk of a car.  The defendants then drove the victim to a

second location on Signal Mountain, where they forced him out of the car, "assaulted him, took money from him, or his shoes" and then left the victim alone and barely conscious in the woods, still bound with duct tape. The victim was eventually able to free himself and get to a nearby highway, where he flagged down a passing driver.

Following the guilty plea submission hearing, the defendant submitted to the trial court an application for judicial diversion.

The presentence investigation report, which was exhibited to the December 2, 2015 sentencing hearing, established that the defendant, who had turned 18 only two months before committing the offenses against the victim, had juvenile adjudications dating back to shortly after he turned 12 years old. The defendant had never been employed, and he dropped out of high school after being arrested in this case. He admitted using marijuana on a regular basis and tested positive for the use of marijuana on November 3, 2015. The defendant reported that he lived with his mother and stepfather, but the defendant's mother would not allow the investigator inside the home for a home visit. The defendant also missed his initial appointment to be interviewed for the presentence report. The preparer of the report noted that the defendant "is a self[-]proclaimed musician/rapper" who "is also known as 423BOYZ and 'HDR.'" Music videos made by the defendant and attached to the report showed "the use and s[ale] of drugs." Audio recordings of the defendant's "music" were also included with the report. As noted by the preparer of the report, the introductory portion of one of the audio recordings "is a copy of a news feed concerning this case" and another "makes allegations and/or threats to the Sequatchie County Sheriff Ronnie Hitchcox, Officer Marlin Hobbs, Sequatchie County High School Faculty, and Sequatchie County Juvenile Officer, Kim Dean." Screen shots of the defendant's Facebook page appended to the report showed photographs depicting the use of drugs and messages of violence toward the police.

At the hearing, Sequatchie County Sheriff's Detective Jody Lockhart testified that the sheriff's department had obtained a text message sent from the defendant's cellular telephone wherein the defendant had threatened to shoot a man named David Smith. Detective Lockhart also obtained messages from the defendant's Facebook account that included threats to harm Mr. Smith. Apparently, Mr. Smith had been involved in an altercation with a friend of the defendant's outside of a bail bonding company.

The 18-year-old defendant admitted that he concocted the plan to kidnap the victim and rough him up as revenge for the victim's having robbed him of money and marijuana on his birthday. After learning that the victim was at a party in Dunlap, the defendant armed himself "to make things smoother. I figured he would subdue to a

weapon more than if we didn't have a gun." The four defendants then went to Walmart, where they purchased duct tape with which they planned to bind the victim. They traveled to the party, where Ms. Shular, who was dating the defendant, lured the victim outside. The defendant held the victim at gunpoint, and then the co-defendants bound the victim's hands and feet and covered his eyes with duct tape. They forced the victim into the trunk of the car and then drove to a location on Signal Mountain selected by the defendant. At that location, the defendant forced the victim from the trunk and began to beat him with his hands, knocking him to the ground. The defendant then kicked and hit the victim while Mr. Lepard struck the victim with a tire iron. After the victim urinated on himself, the defendant decided that the victim had had enough, and he ordered the others to stop hitting the victim. The defendant said that he went through the victim's pockets with an intent to take money from the victim, but the victim had none. The defendant acknowledged that the victim's shoes came off during the attack, but he denied having taken the shoes. The defendants then left the victim, who was "definitely not fully conscious," alone in the woods.

The four defendants traveled to the home of Mr. Lepard's mother, where they "[d]ropped the guns off" and changed clothes. They then traveled to the trailer the defendant shared with Mr. Lepard, where they waited for Mr. Lepard's mother to pick them up. Ms. Lepard's mother picked up the men and took them to her home, where they went to sleep. When the defendant returned to his own residence later that same day, he was arrested.

The defendant acknowledged sending threatening messages to Mr. Smith, but he explained that he had done so because Mr. Smith had assaulted his "best friend since third grade" who was also a member of the defendant's music group. The defendant said that his group had performed at "[m]ultiple places." He acknowledged that the recordings were laden with profanities but denied that he had threatened anyone in his lyrics. He insisted that he had recorded the "song" in question more than two years before the sentencing hearing, at a time when Officer Marlin Hobbs was the school resource officer at Sequatchie County High School. He said that the lyrics were meant to convey his "[a]nger" and "[d]islike" for the named individuals. He conceded that he had missed his initial appointment to be interviewed for the presentence report because he had gone to visit Ms. Shular in Sevierville, where she was incarcerated on an unrelated robbery charge.

Upon questioning by the State, the defendant admitted that he had previously sold marijuana to "whoever would buy it" in order to "pay bills." He said that he quit selling marijuana only when he was arrested in this case. He admitted that he threatened to assault Mr. Smith after he pleaded guilty in this case and while he was

awaiting sentencing.  The defendant conceded that he had used marijuana in the week prior to the sentencing hearing and that he could not pass a drug test.

The defendant's mother, Amy Rutherford, testified that she did not let employees of the probation office inside her house when they came for a home visit because her "house was a total wreck and [she] was embarrassed."  Ms. Rutherford said that the defendant had "cried every time" she visited him at the jail because "he was sad that he had disappointed" her and because "[h]e didn't get to graduate" with his class. She expressed a willingness to help the defendant comply with the conditions of a sentence involving release into the community.

At the conclusion of the hearing, the trial court denied judicial diversion and ordered that the defendant serve his entire sentence in confinement.

In this timely appeal, the defendant argues that the trial court erred by denying his bid for judicial diversion and by ordering a fully-incarcerative sentence.

Our standard of review of the trial court's sentencing determinations in this case is whether the trial court abused its discretion, but we apply a "presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012).  The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed."  T.C.A. § 40-35-103(5).  Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'"  *Bise*, 380 S.W.3d at 706 n.41 (citing T.C.A. § 40-35-210(e)).  Under the holding in *Bise,* "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute."  *Id.* at 709.  The *Bise* standard of review applies to "appellate review for a trial court's sentencing decision to either grant or deny judicial diversion," *State v. King*, 432 S.W.3d 316, 325 (Tenn. 2014), and to "questions related to probation or any other alternative sentence," *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012).

*Judicial Diversion*

"Judicial diversion" is a reference to the provision in Tennessee Code Annotated section 40-35-313(a) for a trial court's deferring proceedings in a criminal case.  *See* T.C.A. § 40-35-313(a)(1)(A).  Pursuant to such a deferral, the trial court places

-4-

the defendant on probation "without entering a judgment of guilty." *Id.* To be eligible or "qualified" for judicial diversion, the defendant must plead guilty to, or be found guilty of, an offense that is not "a sexual offense or a Class A or Class B felony," and the defendant must not have previously been convicted of a felony or a Class A misdemeanor. *Id.* § 40-35-313(a)(1)(B)(i)(b), (c). Diversion requires the consent of the qualified defendant. *Id.* § 40-35-313(a)(1)(A). "[A] 'qualified' defendant is not necessarily entitled to diversion. Whether to grant judicial diversion is left to the discretionary authority of the trial courts." *King*, 432 S.W.3d at 326. Following a determination that the defendant is eligible for judicial diversion, the trial court must consider

> "(a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, and (f) the deterrence value to the accused as well as others. The trial court should also consider whether judicial diversion will serve the ends of justice—the interests of the public as well as the accused."

*Id.* (quoting *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996)). "Further, the trial court must weigh the factors against each other and place an explanation of its ruling on the record." *King*, 432 S.W.3d at 326 (citing *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998)). Adoption of the *Bise* standard of review for judicial diversion "did not abrogate the requirements set forth in *Parker* and *Electroplating*, which are essential considerations for judicial diversion." *King*, 432 S.W.3d at 326.

While considering the defendant's application for judicial diversion, the trial court described the defendant's "social history" as "very troubled," noting that the defendant had experienced "problems with the juvenile system at least since he was 12," including adjudications of burglary of a habitation, vandalism, criminal trespass, and arson. The trial court observed that the defendant's record of having been remanded to the custody of the Department of Children's Services "does not stand well for the defendant." The court concluded that the defendant's "social history is a negative towards a diversion."

The court found that the defendant "was the main man . . . of the whole event," having planned the offenses and procured supplies for committing them. The court determined that the defendant's attitude, as manifested by his Facebook posts and music lyrics, "was not good." In particular, the court expressed concern that the defendant "seems to have grudges and so forth" and that he was "kind of proud of being a

-5-

tough guy." The court concluded that the defendant's attitude "doesn't stand good for diversion."

The trial court found that the defendant's behavior since his arrest had been "bad," observing that the defendant "continued to both engage in illegal conduct, marijuana usage, and also threats that would amount . . . to some form of assault towards other people." Examining the defendant's home life, the court noted that the defendant had "had problems since he's been old enough to have problems" and that the defendant's mother was not "necessarily" supportive. The court concluded that "the home conditions" were "at best, zero. It's probably on the negative side, so that's not going to help him get diversion."

The trial court also found that the defendant had "[u]ncontrollable anger," no employment history, no family responsibilities, and a poor reputation given his own boasting. The court classified the defendant's attitude towards law enforcement as negative and his mental health as "questionable given the history of some of these events he's been involved in in the last three or four years."

The trial court emphasized the seriousness of the offense in this case as well as the defendant's escalating pattern of violence, "breaking in homes and burning things down and threatening people and actually carrying through with [those] threats." The court observed that the defendant essentially left the "not fully conscious" victim in the woods to die after "having been hit with tire irons and kicked and all this sort of thing." The court concluded that "you can't slap somebody on the back of the hand for duct taping somebody, throwing them in the back of a car, beating the hell out of them[,] and leaving them to die. That's just what it is." Finally, the court determined that "there's no way the ends of justice could be served by putting him in a status that would create no record at all of his conduct over time and could cause other people to rely on his lack of record . . . to their detriment."

Based upon these findings, the court concluded that it could not place the defendant on judicial diversion.

The trial court carefully considered each of the factors enumerated in *Parker* and weighed them against each other, placing its findings in the record, as required by *Electroplating, Inc.* Thus, we "apply a presumption of reasonableness" and we will "uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision." *Id.* at 327. Based upon our review of the record, we easily conclude that there was substantial evidence to support the denial of judicial diversion in this case. The plea agreement allowed the defendant to plead to a single reduced charge of robbery in exchange for a lenient six-year sentence despite that the record clearly

-6-

established that the defendant acted as the leader in the armed kidnapping, assault, and robbery of the victim. The 18-year-old defendant's record of criminal activity spanned six years and included offenses of ever-increasing severity, and he acknowledged that before his arrest in this case, he sold marijuana as means to support himself. Although his mother offered to help the defendant comply with the conditions of judicial diversion, the record establishes that the defendant lived in her home only sporadically following his 18th birthday. That he used marijuana and threatened to assault Mr. Smith while awaiting sentencing evinces an inability to comply with the conditions of any sentence involving release into the community. The violent and profanity-laden lyrics of his "music" as well as the glorification of drug culture featured in his videos and Facebook posts suggest a poor attitude toward the law and law enforcement as well as a lack of amenability to correction.

*Alternative Sentencing*

The defendant also contends that the trial court erred by ordering that he serve his entire sentence in confinement.

The trial court correctly observed that the defendant was not statutorily eligible for a Community Corrections placement because he had been convicted of robbery, a crime against the person. *See* T.C.A. § 40-36-106(a)(1). The imposition of a six-year sentence in this case, however, mandated the trial court's considering probation as a sentencing option. *See* T.C.A. § 40-35-303(a), (b). Traditionally, the defendant has borne the burden of establishing his "suitability for full probation." *State v. Mounger*, 7 S.W.3d 70, 78 (Tenn. Crim. App. 1999); *see* T.C.A. § 40-35-303(b). Such a showing required the defendant to demonstrate that full probation would "'subserve the ends of justice and the best interest[s] of both the public and the defendant.'" *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990) (quoting *Hooper v. State*, 297 S.W.2d 78, 81 (1956), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 9-10 (Tenn. 2000)). As indicated, however, the supreme court expanded the holding in *Bise* to the trial court's decision regarding probation eligibility, ruling "that the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." *Caudle*, 388 S.W.3d at 278-79.

When a trial court orders confinement and therefore rejects any form of alternative sentencing such as probation, split confinement, or periodic confinement, it must base the decision to confine the defendant upon the considerations set forth in Code section 40-35-103(1), which provides:

(1) Sentences involving confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant; . . . .

T.C.A. § 40-35-103(1).

In this case, the trial court found that the defendant had a long history of criminal conduct as evidenced by his six-year history of juvenile adjudications, his continuing use of marijuana even after pleading guilty, and his making threats on Facebook. The court also found that confinement was necessary to avoid depreciating the seriousness of the offense because the victim's "life was placed in jeopardy." The court noted that the facts as testified to by the defendant established that "[t]his was clearly a kidnapping and an aggravated assault" and found that, based on his plea to a single count of robbery, the defendant had "gotten all the leniencies that the system ought to give him." The court found that measures less restrictive than confinement had frequently been applied unsuccessfully to the defendant, noting that "he's been really under the eye of the juvenile court since he was 12 years old" to "[n]o effect." The trial court determined that the defendant was not amenable to alternative sentencing because he had demonstrated an inability to follow rules. Based upon these findings, the trial court ordered the defendant to serve his entire six-year sentence in confinement.

We conclude that the same factors that supported the denial of judicial diversion justified the denial of probation and split confinement in this case. The 18-year-old defendant had a six-year history of juvenile adjudications and admitted having sold marijuana and having used it on a regular basis even after he pleaded guilty in this case. He made threats via text message and Facebook while awaiting sentencing. Most importantly, we agree with the trial court that confinement was necessary to avoid depreciating the seriousness of the offense. The defendant pleaded guilty to robbery. The record established that, after learning that the victim was at a party, the defendant, with the assistance of his co-defendants, armed himself and procured duct tape to bind

-8-

the victim. The defendant arranged for the victim to be lured outside, where the defendant forced him into a car at gunpoint. The defendants bound the victim's hands and feet with duct tape and covered his eyes with duct tape. They then drove him to a location selected by the defendant where they "beat the hell out of him," rifled through his pockets and took his shoes, then basically left him for dead. These facts could have supported convictions of the charged offenses of aggravated kidnapping and aggravated robbery; thus, the defendant received a very beneficial plea agreement, which "colors the nature and circumstances of the *conviction offense*." *State v. John Clayton Fields*, No. M2014-01691-CCA-R3-CD, slip op. at 9 (Tenn. Crim. App., Nashville, July 6, 2015), *perm. app. denied* (Tenn. Oct. 23, 2015) (emphasis in original). We have consistently "recognized that leniency in the terms of a plea agreement may support the imposition of a formidable sentence." *See id.*, slip op. at 9-10; *see also, e.g.*, *State v. Krystal Bowman*, No. E2011-01906-CCA-R3-CD (Tenn. Crim. App., Knoxville, Aug. 13, 2012); *State v. Larry J. Coffey, Jr.*, No. E2008-00087-CCA-R3-CD (Tenn. Crim. App., Knoxville, Feb. 18, 2009).

      Accordingly, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE